**STATE of Utah, Plaintiff and Appellee,**

v.

**Benjamin Eagle DUTCHIE, Defendant and Appellant.**

**No. 970027.**

Supreme Court of Utah.

Oct. 16, 1998.

Jan Graham, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, for Plaintiff and Appellee.

Linda M. Jones, Mark R. Moffat, Salt Lake City, for Defendant and Appellant.

HOWE, Chief Justice:

Defendant Benjamin Dutchie entered conditional pleas of guilty to two counts of aggravated burglary and two counts of aggravated kidnapping. He appeals from these convictions, contending that the trial court erred by failing to suppress his confession and other incriminating statements.

## BACKGROUND

In 1995, Dutchie committed a series of home-invasion robberies. In selecting his victims, he randomly went door-to-door asking for someone named "Jennifer." He employed this scheme to locate elderly persons who he thought would be easy targets. At that time, he was fifteen years old.

Dutchie's first victim was Edward Hanley, an elderly man recovering from recent cancer surgery. Dutchie forced his way into Hanley's home at gun point, robbed him of $32, and forced him to drive to an automated teller machine, where he withdrew $300 from his bank account for Dutchie. After returning to Hanley's home, Dutchie struck him on the head with his gun, knocking Hanley to the floor.

Dutchie's second victim was Betty Legg. He entered Legg's residence through a window and confronted her with a gun. As he did with Hanley, Dutchie forced Legg to drive him to an automated teller machine, where she withdrew $300 from her account for him. Upon returning to her residence, he attempted to forcibly remove parts of her clothing, but she called to her husband, Jarrell Legg, for help. Dutchie then left, taking money, liquor, a gun, and Mr. Legg's automobile, a red Dodge Intrepid.

On the following day, Salt Lake City Police Officers Jeffery Webb and Morgan Sayes observed Dutchie driving Mr. Legg's automobile. After confirming that the vehicle Dutchie was driving had been reported stolen, the two officers commenced a felony stop. They pulled up behind the Intrepid, which was already being stopped by a motorcycle officer, drew their weapons, ordered Dutchie out of the vehicle, and ultimately took him into custody. Officer Webb then informed him that the car he was driving had been reported stolen and asked him for his name and age. Dutchie replied that his name was "Daniel Sunwalker," that he was eleven years old, and that a friend named "Fupa" had stolen the vehicle the night before and had given Dutchie $40 to watch it for him. Dutchie then told the officers he was going to meet "Fupa" at a nearby bowling alley. In view of this story, the officers took Dutchie to the bowling alley, where he

identified a person there as "Fupa." But after further investigation, the officers determined that this person was not involved in the theft of Mr. Legg's automobile or in any of the other crimes committed against the Leggs and Mr. Hanley.

After discovering that Dutchie's story was false, the officers transported him to the police station, where he was placed in an interview room and questioned by Detective Ray Dalling, a Salt Lake City robbery detective.

Before giving Dutchie the *Miranda* warnings, Detective Dalling filled out a personal history questionnaire on him. Dutchie again stated that his name was "Daniel Sunwalker," but this time he admitted that he was fifteen years old. After Dalling completed the personal history questionnaire, which took about six minutes, he advised Dutchie of his *Miranda* rights. The detective read each right to him and specifically asked him whether he understood that right; Dutchie responded that he did and agreed to talk to the detective without the presence of counsel.

Having obtained Dutchie's waiver, Detective Dalling proceeded to question him about the Dodge Intrepid. At first, Dutchie denied any involvement in the theft of the vehicle. Dalling then left the room for about five or ten minutes. When he returned, he told Dutchie that he knew Dutchie was involved in the theft of Mr. Legg's automobile. At this point, Dutchie gave a full confession, admitting that he had committed the various criminal acts against the Leggs and Hanley. Detective Dalling then asked him to write a letter of apology to Mrs. Legg, which the detective kept as a written confession.

Following Dutchie's confession, he was transported to a juvenile detention center. The juvenile court certified Dutchie to stand trial as an adult in district court pursuant to Utah Code Ann. § 78–3a–603. Thereafter, Dutchie was formally charged by information with nine separate first degree felonies, including two counts of aggravated burglary in violation of Utah Code Ann. § 76–6–203; three counts of aggravated robbery in viola-

tion of Utah Code Ann. § 76–6–302; two counts of aggravated kidnapping in violation of Utah Code Ann. § 76–5–302; one count of aggravated sexual assault in violation of Utah Code Ann. § 76–5–405; and one count of aggravated sexual abuse of a child in violation of Utah Code Ann. § 76–5–404.1.[1] The State further alleged that Dutchie had used a firearm or a facsimile of a firearm in connection with eight of the counts in the information. He was also charged with one count of theft, a second degree felony, in violation of Utah Code Ann. § 76–6–404.

During the pretrial proceedings in district court, Dutchie moved to suppress the confession and other incriminating statements that he had made to police on the basis that they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He first assailed the statements that he made at the scene of his arrest and his responses to Detective Dalling's questionnaire on the ground that Detective Dalling interrogated him without first advising Dutchie of his *Miranda* rights or obtaining a waiver of those rights. He also asserted that Detective Dalling obtained his confession illegally because his waiver of *Miranda* was not knowing, intelligent, or voluntary. After each side presented evidence and oral argument on these issues, the court denied Dutchie's motion. The court held that he validly waived his rights before giving his confession to Detective Dalling, but did not specifically rule on the issue of his pre-*Miranda* statements.

Following the court's ruling, Dutchie entered conditional pleas of guilty to two counts of aggravated burglary and two counts of aggravated kidnapping. In exchange for his pleas, the State agreed to dismiss all remaining charges and firearm enhancements. His pleas were conditioned on his right to appeal the court's order denying his motion to suppress. He now appeals from that order contending that the trial court erred in (1) failing to suppress certain statements he made without the benefit of the *Miranda* warnings; and (2) finding that he knowingly, intelligent-

---

1. The charge of aggravated sexual abuse of a child was unrelated to the crimes Dutchie committed against the Leggs and Hanley. Prior to

these crimes, Dutchie had allegedly sexually abused a four-year-old girl while baby-sitting her.

ly, and voluntarily waived his *Miranda* rights before giving a full confession to Detective Dalling at the police station.

## ANALYSIS

### I. DUTCHIE'S PRE-*MIRANDA* STATEMENTS

Dutchie first contends that the trial court erred in failing to suppress certain statements that he made before the officers gave him the *Miranda* warnings. He asserts that Officer Webb and Detective Dalling each interrogated him without first advising him of his rights or obtaining a waiver of them. Officer Webb asked him questions at the scene of his arrest about his name and age, and Detective Dalling asked him questions from a personal history questionnaire, all before he was read the *Miranda* warnings. He maintains that such questioning constituted a per se violation of *Miranda*.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court stated that

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 300–01, 100 S.Ct. 1682 (footnotes omitted) (emphasis added). The law of this state also recognizes that words or actions normally attendant to arrest and custody do not constitute interrogation. *See State v. Wilson*, 701 P.2d 1058 (Utah 1985) (per curiam) (holding that Utah Code Ann. § 77–7–6 expressly requires officers to inform suspect of reason for arrest and that suspect's incriminating response to such statements by police

is not product of custodial interrogation); *State v. Hayes*, 860 P.2d 968 (Utah Ct.App. 1993) (same).

 At the scene of his arrest, Officer Webb asked Dutchie for his name and age. Dutchie replied that his name was "Daniel Sunwalker" and that he was eleven years old. When Webb told Dutchie that he did not believe that he was eleven, Dutchie launched into a story about how somebody named "Fupa" had stolen the Dodge Intrepid the night before and gave Dutchie $40 to watch it for him. Webb's words were those that are normally attendant to arrest and custody and were not likely to elicit an incriminating response from Dutchie. Webb did not ask him why he was lying about his age; he merely commented that he did not believe that Dutchie was only eleven years old. He had no reason to believe that Dutchie would respond by making incriminating statements about how he came into possession of the stolen car.[2] We therefore hold that Dutchie's statements to Officer Webb were voluntary, spontaneous, and not the product of interrogation. *See Miranda*, 384 U.S. at 478, 86 S.Ct. 1602 (stating that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [*Miranda* ]"). We likewise reject Dutchie's argument that his responses to Detective Dalling's questionnaire were obtained illegally because Dutchie had not been given the *Miranda* warnings beforehand. Like Officer Webb's questions, the questions asked in the questionnaire were those normally attendant to arrest and were not likely to elicit incriminating statements. The questionnaire sought (1) Dutchie's name and address, (2) his age, (3) his height and weight, (4) his education, (5) his employment, (6) his personal goals, (7) any medications he was taking, and (8) when he last slept. These questions sought general background information, completely unrelated to the crimes that Dutchie was suspected

---

**2.** Although Dutchie's response could arguably be considered exculpatory in nature, *Miranda* prohibits the use of both inculpatory and exculpatory statements obtained in violation of its principles. 384 U.S. at 444, 86 S.Ct. 1602. Therefore, the nature of such statements is unimportant to our decision of whether the trial court should

have suppressed such statements. We nevertheless believe that Dutchie's statements were inculpatory in nature because he essentially admitted to the crime of theft by acknowledging that he knowingly received stolen property. *See* Utah Code Ann. § 76–6–408.

of committing. They helped Detective Dalling determine whether Dutchie was in a condition to be questioned and capable of giving a valid waiver. Although it is true that Dalling admitted during the suppression hearing that the questionnaire can have the effect of getting the accused comfortable with answering questions, the questions neither sought nor elicited any incriminating information. Furthermore, after Dutchie completed the questionnaire, Dalling advised him of his rights, obtained a waiver, and then began questioning him about his involvement in the home-invasion robberies. In light of the foregoing, we hold that Detective Dalling's questionnaire did not amount to interrogation.

In sum, we conclude that neither Officer Webb's questions at the scene of Dutchie's arrest nor the questions asked in Detective Dalling's questionnaire constituted interrogation for purposes of *Miranda*. Thus the trial court did not err in refusing to suppress Dutchie's statements and responses even though they were made without the benefit of the *Miranda* warnings.

## II. DUTCHIE'S POST-*MIRANDA* CONFESSION

Dutchie's next contention is that the trial court erred in holding that he validly waived his *Miranda* rights before Detective Dalling interrogated him at the police station. He asserts that he did not knowingly, intelligently, or voluntarily waive those rights and that his subsequent confession should have been suppressed. We disagree.

■ We first note that the State bears the burden of showing that the accused gave a valid waiver of his *Miranda* rights prior to making incriminating statements during custodial interrogation. *See Miranda*, 384 U.S. at 475, 86 S.Ct. 1602. In making this determination, the court looks at the totality of the circumstances, even when the accused is a juvenile. *See State v. Hegelman*, 717 P.2d 1348, 1349 (Utah 1986); *State v. Hunt*, 607 P.2d 297, 300 (Utah 1980); *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Furthermore, we review a trial court's finding valid waiver of *Miranda* rights for correctness, granting some

degree of discretion to the trial court because of the wide variety of factual settings possible. *See State v. Leyva*, 951 P.2d 738, 741 (Utah 1997).

We have summarized the totality of the circumstances test as applied to juveniles as follows:

"[A] minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement."

*Hunt*, 607 P.2d at 300 (quoting *People v. Lara*, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202, 215 (Cal.1967)). We also consider "questions of duress, threats, promises or other coercion traditionally considered in reviewing the confession of an adult defendant." *Id.* at 301. Each of these factors must be examined in the instant case.

■ Dutchie was only fifteen years old at the time he was interrogated by Detective Dalling. Although this is a young and immature age, the age of the accused is only one factor we consider and is not determinative. If the other factors weigh in favor of and show that the accused validly waived his *Miranda* rights, then we will uphold the waiver and subsequent confession despite the accused's young age.

In the recent case of *State v. Piansiaksone*, 954 P.2d 861 (Utah 1998), we upheld the *Miranda* waiver of a sixteen-year-old juvenile. Although we acknowledged that the juvenile's youth was a significant factor, we concluded that the remaining factors showed that he had validly waived his rights and upheld the admissibility of his confession. *Id.* at 866. We observed that "he may have had more life experience than his age suggest[ed]." *Id.*

Like the juvenile in *Piansiaksone*, Dutchie also may have been more experienced and brazen than his age suggests. The trial court acknowledged that "[t]he nature of the

conduct admitted to by the defendant demonstrates a capacity for cunning and planning." Dutchie sought out his victims by going door-to-door asking for someone named "Jennifer." When he found a person that he thought he could easily victimize, he broke into their home, robbed them at gun-point, and forced them to drive him to an automated teller machine, where he made them withdraw money from their bank account for him. As the trial court correctly pointed out, this conduct suggests that "[Dutchie] is not a person who would be easily intimidated," despite his young age.

Dutchie contends, however, that the trial court did not sufficiently consider his youth and should have suppressed his confession on the basis of Detective Dalling's alleged disregard of the laws and rules that afford juvenile suspects special rights and protections. For instance, he argues that the detective violated Utah Code Ann. § 78–3a–508 by failing to immediately contact his mother after his arrest and by detaining him at the police station for purposes of interrogation. That section provides in part:

> (3) (a) If an officer or other person takes a minor into temporary custody, he shall without unnecessary delay notify the parents, guardian, or custodian. The minor shall then be released to the care of his parent or other responsible adult, unless his immediate welfare or the protection of the community requires his detention.
>
> . . . .
>
> (4) (a) A minor may not be held in temporary custody by law enforcement any longer than is reasonably necessary to obtain his name, age, residence, and other necessary information and to contact his parents, guardian, or custodian.
>
> (b) If the minor is not released under Subsection (3), he shall be taken to a place of detention or shelter without unnecessary delay.

*Id.* § 78–3a–508(3)(a), (4)(a), and (b); *see also* Utah R. Juv. P. 22(b) (providing that "[w]hen any peace officer or other person makes an arrest of a minor without a warrant, the minor shall be taken to a detention center pending a detention hearing").

▬ Notwithstanding the foregoing provisions, we reject Dutchie's argument. We have previously held that section 78–3a–508 was not enacted to govern police interrogations of juvenile suspects. *See In re T.S.V.,* 607 P.2d 827, 828 (Utah 1980) (holding that the predecessor to Utah Code Ann. § 78–3a–29 was not enacted to govern police interrogations of juveniles); *Hunt,* 607 P.2d at 302 (Utah 1980) (same). Therefore, Detective Dalling's violation, if any, of the rules and statutes governing arrest and custody of juvenile suspects does not by itself provide a basis for concluding that Dutchie's waiver was invalid. Rather, as we have stated above, we look at the totality of the circumstances to review such waivers.

▬ Having considered Dutchie's age, we turn now to the remaining factors under the totality of the circumstances test. At the hearing on Dutchie's motion to suppress, both parties submitted evidence concerning Dutchie's intelligence, education, and ability to comprehend the *Miranda* warnings and the effect of his waiver. Dutchie presented the testimony of Dr. Vickie Gregory, a forensic neuropsychologist, who examined him after his arrest. She testified that Dutchie has been diagnosed with (1) attention deficit hyperactivity disorder (ADHD); (2) a developmental expressive language disorder; (3) an oppositional defiant disorder; and (4) four different psychotic disorders, one of which resulted in auditory hallucinations. She testified that these conditions disrupted Dutchie's ability to concentrate, caused him to be hyperactive and impulsive, and made it difficult for him to communicate.

Dr. Gregory also conducted intelligence testing on Dutchie. She determined that his verbal I.Q. score was 79, which is the borderline of average; his performance I.Q. was 104, which is slightly above average; and his overall I.Q. was 90, which is average. She also concluded that Dutchie read on a second or third grade level, while the language contained in the *Miranda* warnings is equivalent to a fifth or sixth grade reading level.

Notwithstanding the foregoing, Dr. Gregory was unable to give an opinion of whether Dutchie understood Detective Dalling's *Miranda* warnings. Dr. Gregory acknowledged

that when she asked Dutchie to parrot the warnings as a test, he replied, "[The right] to remain silent, to have a lawyer present, you don't have to speak to the police." Furthermore, when she asked him what the warnings meant, he responded, "It's the law." He further explained: "If you choose to, you do not have to speak to the cops. To have a lawyer present, to remain silent [sic]." Dr. Gregory also testified that because Dutchie suffered from ADHD and had admitted to her that he was not doing his best during some of the tests, she believed that some of the test results were not entirely accurate.

On the basis of this testimony, the trial court concluded that Dutchie was able to understand the *Miranda* warnings and the effect of his waiver. We do not think that this was error. While it is true that some of Dr. Gregory's testimony suggests that Dutchie's intelligence was below average and that he had psychological problems, we think that his ability to parrot back portions of the warnings and his understanding of their meaning is sufficient to support the trial court's conclusion. His responses to Dr. Gregory's questions show he understood that he did not have to talk to Detective Dalling, that the law protected his right to remain silent, and that he had the right to have an attorney present during questioning.

■ Dutchie's prior experience with police and the criminal justice process also weighs in favor of the trial court's finding that he validly waived his rights. His juvenile record consisted of forty-six criminal episodes, beginning when he was eight years old. Although the record does not provide the exact number of times that Dutchie was interrogated by police, we can safely infer that the interrogation by Detective Dalling was not his first. We can also infer that Dutchie had a basic understanding of the juvenile justice system and recognized the function of police and counsel in that process.

■ With respect to the presence of an attorney, parent, or friend during questioning, we note that no such person was present. Dutchie asserts that we should find that he did not validly waive his *Miranda* rights because Detective Dalling did not immediately call his mother even though he gave Dall-

ing the number early on during the interrogation. This court, however, has previously stated that "a child is [not] necessarily incompetent to waive his rights because of his infancy; nor do we agree that such a choice should lie with a child's parent, adult friend or attorney." *Hunt*, 607 P.2d at 300 (footnote omitted). Dutchie did not request to speak to his mother or an attorney prior to or during the interrogation. Rather, after Dalling read each warning to Dutchie, he said that he understood that right and wanted to talk to the detective. Thus, while the presence of a parent or an attorney is a factor that should be considered by the court, it is not determinative, and the lack thereof does not make the waiver invalid per se.

■ Dutchie's state of mind during the interrogation also supports the finding of a valid waiver. Detective Dalling testified that Dutchie did not appear to be intoxicated or under the influence of any drugs during questioning. He stated that Dutchie was responsive to his questions, did not appear confused or afraid, and appeared to be relaxed. In light of this evidence, the trial court did not err in finding that "[Dutchie] coped well during the police interview."

■ The final issue before us is whether Detective Dalling used threats, promises, or other forms of coercion in obtaining Dutchie's waiver and confession. Dutchie first contends that Dalling tricked him into making a written confession by suggesting that he write a letter of apology to Mrs. Legg. Even assuming that Dalling tricked Dutchie into making a written confession, such conduct did not amount to coercion under the circumstances of this case. At the time Dalling suggested that Dutchie write a letter of apology to Mrs. Legg, Dutchie had already given a full confession. His written "letter of apology"/confession was therefore not absolutely necessary because Detective Dalling could have testified to the verbal confession at trial. *See State v. Villarreal*, 889 P.2d 419, 427 (Utah 1995) (holding that while a contemporaneous commemoration of the confession should be made whenever possible, it is not constitutionally mandated); *see also* Utah R. Evid. 801(d)(2) (party's admission is not

hearsay). Therefore, the written confession was not constitutionally significant.

 Dutchie also argues that Dalling coerced his confession by misleading him into believing that the detective knew he was involved in the home-invasion robberies. He contends that Dalling left the room for a period of time and that when he returned, he told Dutchie that he knew Dutchie was involved in the robberies. Dutchie maintains that he was led to believe that the detective had gone out and obtained further evidence against him. We note, however, that such a tactic, by itself, is generally not sufficient to amount to coercion. *See State v. Galli*, 345 Utah Adv. Rep. 7, 10, 967 P.2d 930, 936 (Utah 1998) (stating that half truths regarding the strength of the evidence against defendant does not constitute coercion). The detective already had strong reason to believe that Dutchie was involved; after all, Dutchie was caught driving Mr. Legg's Dodge Intrepid. We thus find it hard to believe that Detective Dalling's statement that he knew Dutchie was involved was so shocking to Dutchie that it coerced him into confessing.

In sum, we conclude that the totality of the circumstances supports the trial court's finding that Dutchie knowingly, intelligently, and voluntarily waived his rights to remain silent and to have counsel present before giving a confession to Detective Dalling at the police station. We therefore affirm the trial court's finding that he made a valid waiver of his *Miranda* rights.

## CONCLUSION

We conclude that the trial court did not err in denying Dutchie's motion to suppress. His statements to Officer Webb at the scene of his arrest and his responses to Detective Dalling's questionnaire were not the product of interrogation and, therefore, were admissible as evidence against him even though he was not advised of his *Miranda* rights beforehand. Moreover, the totality of the circumstances adequately supports the trial court's conclusion that he knowingly, intelligently, and voluntarily waived his rights before being interrogated by Dalling at the police station. We therefore affirm the trial

court's order denying his motion to suppress his confession.

Associate Chief Justice DURHAM, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE's opinion.